]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LORI MORTENSEN,                    )
                                   )
          Plaintiff,               )   Case No. CV06-541-HU
                                   )
     vs.                           )      OPINION AND ORDER
                                   )
PACIFICORP,                        )
an Oregon corporation,             )
                                   )
          Defendant.               )
_____)

Matthew B. Duckworth
Busse & Hunt
521 American Bank Building
621 S.W. Morrison Street
Portland, Oregon 97205
     Attorney for plaintiff

Calvin L. Keith
Cody M. Weston
Perkins Coie
1120 N.W. Couch Street, 10th Floor
Portland, Oregon 97209
     Attorneys for defendant

1   - OPINION AND ORDER

HUBEL, Magistrate Judge:

This is an action for employment discrimination and retaliation based on disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12110 *et seq.* (ADA),[1] and Oregon law; interference with plaintiff's rights under the federal Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (FMLA) and the Oregon Family Leave Act, Or. Rev. Stat. § 659A.100 *et seq.* (OFLA); and wrongful discharge. Plaintiff alleges that she is disabled by sleep apnea and chronic obstructive pulmonary disease (COPD), and that she was denied leave and ultimately terminated after she requested accommodations for this disability. Defendant asserts that plaintiff was terminated for job performance issues.

Defendant moves for summary judgment on all claims.

## Factual Background

Plaintiff Lori Mortensen began working for defendant Pacificorp in March 2001 and was terminated in August 2005. For most of her tenure, she worked as an administrative assistant to Blaine Andreasen, a Wyoming-based managing director supervising approximately 600 employees across a six-state service area. She performed administrative and clerical tasks for Andreasen and other members of the metering group. In 2005, Mortensen worked

---

[1] Plaintiff has dismissed disability claims based on hostile work environment and on being "perceived as" disabled.

briefly for Jim Wagner, a director of the metering group, who reported to Andreasen.

During the first two years of Mortensen's employment, Andreasen was satisfied with her performance, and gave her positive performance evaluations.[2] He characterized her as "very helpful" and "very loyal." Weston Declaration, Exhibit B, Andreasen deposition, 25:2-15 (hereinafter Andreasen dep.) Nevertheless, Andreasen has testified that during those first two years, "there were people on my staff that were frustrated with Lori," and who complained to him about her. Andreasen dep. 30:8-13. Andreasen testified that he disregarded these complaints because at that time he had his "hands full with 600 employees, and a lot of changes to be made," and he did not want to "spend a lot of time trying to address an issue with my assistant who was doing fine for me personally." Andreasen dep. 30:14-20.

Mortensen has testified that during her third year of employment, between January and July 2004, she was falling asleep at work several times a day. Duckworth Declaration, Exhibit A, Mortensen deposition 53:21-54:19 (hereinafter Mortensen dep.) She says she told Andreasen about falling asleep at work immediately

---

[2] Andreasen gave Mortensen a "4" overall rating on her midyear performance rating in October 2003, a "3" overall rating on her year end performance rating in April 2004, and a "3+" in November 2004. On Pacificorp's 5-point performance evaluation rating scale, a "4" equals "highly effective," Weston Exhibit L, p. 14, and a "3" means fully effective. Id. A "2" means "needs improvement." Id.

after she began experiencing the symptoms, Mortensen dep. 48:25-49:18, but Andreasen has testified that Mortensen told him about her sleep apnea during the last year of her employment. See Andreasen dep. 49:25-50:11.

Mortensen was diagnosed with sleep apnea in July 2004. Mortensen dep. 57:17-22. She provided a doctor's note dated July 30, 2004, to Heidi Kucera-Taylor, Disability Services Administrator for Pacificorp; the note stated that Mortensen would suffer "excessive sleepiness until further evaluation and treatment." Duckworth Declaration, Exhibit FF. Mortensen testified that she believes the sleep apnea was "creeping up" on her between 2001 and 2004, and caused her to make more errors at work, made her grumpy, and affected her memory. Mortensen dep. 59:18-60:15. In addition, extended staff meetings were "very difficult" for her because she was so sleepy. Mortensen dep. 60:19-23.

In October 2004, Mortensen began using a CPAP machine to help her sleep. Mortensen dep. 59:8-17. Mortensen testified that "after about a year of using it," the machine enabled her to get a decent night's sleep. Mortensen dep. 59:8-17.

Mortensen was diagnosed with COPD in January 2005; she has testified that the COPD caused her to tire easily and have coughing fits during meetings. Mortensen dep. 62:1-10; 66:8-12;

70:6-9; 64:21-23, 65:6-25.[3] The evidence indicates that Andreasen was aware of these coughing fits, but had not commented on them because he knew Mortensen smoked. Weston Declaration, Exhibit Q.

In January 2005, Mortensen told Andreasen she had COPD. Mortensen claims she made an oral request to Andreasen that she be excused from monthly extended staff meetings or meetings that required travel because of her coughing and the possibility of falling asleep. Mortensen dep. 60:19-24; 66:13-15; 93:14-94:17; 95:10-24; 97:20-25. Mortensen's attendance at the extended staff meetings was required every other month. Mortensen dep. 94:16-17, 97:18-19. Mortensen has testified that Andreasen agreed that she could be excused from extended staff meetings because he "had enough coverage" from two other people, Kelly Cook and Hillary Klumpe-McGowan. Mortensen dep. 94:10-16.

Andreasen has testified that he did not recall Mortensen asking to be excused from staff meetings because of her COPD. Andreasen dep. 82:13-15. Andreasen testified that Mortensen had never liked to attend staff meetings, and over the past four years, "if she could avoid them she did." Andreasen 82:5-12. Andreasen testified that for a year he had asked someone else to

---

[3] Mortensen's testimony is somewhat inconsistent on this point, as she has also testified that she had the cough "at least five years" before being diagnosed with COPD and that she was coughing at meetings during that time. Mortensen dep. 64:7-23. She has also said she had a "bad smoker's cough," but didn't have "fits of coughing" until about 2004. Id. 65:6-25.

attend staff meetings, so "it wasn't really an issue I spent a
lot of time concerned with anymore, whether she attended the
meetings or not." Andreasen dep. 82:18-21; 83:1-7.

The factual record is unclear on when Mortensen asked to be
excused from meetings; whether she asked to be excused from all
meetings or only the all-day extended staff meetings that
occurred every other month; whether she asked to be excused from
meetings because of sleepiness, coughing, or both; and whether
Andreasen excused her from any attendance at meetings or got
others to attend and take minutes in Mortensen's stead.

According to Andreasen, Mortensen's performance began to
worsen during 2004 and 2005, to the "point where as an assistant
I was finding I was using her less and less on a continual basis,
and spending more and more time solving issues and problems."
Andreasen dep. 30:21-31:1. In Andreasen's opinion, many of the
problems were due to Mortensen's inability to get along with
others. Andreasen dep. 32:11-15. According to Andreasen,
Mortensen made simple administrative mistakes, then failed to
acknowledge them and became defensive when confronted. Andreasen
dep. 32:16-33:9.

In March 2005, Mortensen sent Kucera-Taylor an e-mail as
follows:

> I've been telling my supervisor for some time now
> about my health situation, and I don't think he
> believes me. He didn't require documentation from my

6   - OPINION AND ORDER

docs and that was his choice. I have kept him in the loop the entire time; but I still feel it's appropriate to make some aspects official now because of the way he's acting. I'm scared I'm going to lose my job because I literally have not been physically able to take minutes at the all day meetings for the past couple months. Although, I am hoping to improve with the treatments they are giving me. When they added oxygen a couple weeks ago, that helped my sleep patterns a lot.

Duckworth Declaration Exhibit BB. Ms. Kucera-Taylor responded,

Thanks for the note. I have copied Jen [Crosby][4] on this as well so we can be sure to keep her up to date too. From our conversation last week you indicated to me that you are not missing time from work or that you expect to at this time [sic]. I also understand that you are not requesting anything with regard to your daily job duties and a potential health condition. If either of these things should change, please be sure to let me and Jen Crosby know so we can discuss further.

Id. Heidi Kucera-Taylor had talked to Mortensen about FMLA, which Mortensen had never used. Mortensen dep. 102:19-24.

On April 15, 2005, Andreasen gave Mortensen a performance evaluation in which her ratings came down in nearly every area. The assessment states, among other things, that Mortensen "often shows lack of follow through, which often leads to accuracy problems with her work and generally an inconsistent performance." Weston Declaration, Exhibit L, p. 6. Andreasen also noted that Mortensen's "performance this last six months has been sporadic; the progress she made the first six months has actually

_____

[4] Crosby, now Crosby-Meurisse, was the HR person for the metering group. Crosby dep. 6:8-11.

declined." Id. at 6-7.

Andreasen also wrote,

Other members of the Metering Management Team are also concerned with her accuracy and the confusion it often creates, i.e., meeting schedules, instructions she authors, and in general her interaction with others on the team. Lori has the ability to do a fine job and does exhibit this ability on projects she enjoys. Lori tends to find ways to avoid work she either doesn't like or involves a public meeting or setting. ... Her ability to get along with people often hampers her ability to complete a task, or makes that task more difficult. She is reluctant to take minutes and action items for staff meetings and Safety meetings, these tasks have typically fallen on others to complete. When others have stepped up to fill these voids she is critical and uncooperative. Her performance is unacceptable based on her performance these past few months.

Id. at 7. Andreasen noted in the evaluation that Mortensen had made errors with his expense accounts and scheduling, saying, "My schedule is hectic and difficult but too often errors are made that require rescheduling. Meeting notifications and scheduling are often done more than once because of errors, others consistently complain to me about confusion with meetings Lori sets up." Id. at 10.

On April 15, 2005, Mortensen received a documented verbal warning about her poor performance and a written plan for improvement. Andreasen dep. 52:19-23; Weston Declaration, Exhibit M. The warning stated that Mortensen's accuracy, "related to all aspects of job performance" had been "unacceptable," including Andreasen's expenses, meeting notices, and calendar management.

Weston Declaration, Exhibit M. She was criticized for tasks done inaccurately, including expense accounts, meeting notices, and scheduling. Id. Andreasen also noted that Mortensen's demeanor in the workplace was "unacceptable," and that she was "difficult to communicate with, won't listen when given direction, advice, or counsel." Id. Also noted was that when mistakes were made, "considerable time is spent convincing you of the fact," and that considerable time was spent resolving conflicts with other employees. Id. She was also faulted for being inconsistent in her availability during regular work hours and being unwilling to attend meetings. Id.

Mortensen disputed many of these findings. Id. She contacted HR to say she felt she was being discriminated against for a medical condition. Mortensen dep. 100:8-11. On April 20, 2005, Mortensen wrote a letter to Andreasen, with a copy to Jennifer Crosby, asking him to rescind the verbal warning and performance improvement plan. Weston Declaration, Exhibit N. Mortensen accused Andreasen of "making a calculated effort to discipline me because of my medical condition." Id. Mortensen said she loved her job, but Andreasen was "making my work experience intolerable." Mortensen said she thought it would be in her best interest if she had a different supervisor, because "I deserve a workplace that is free of harassment, discrimination and retaliation." Id.

9    - OPINION AND ORDER

Mortensen stated that in the letter that, as she had informed Andreasen a year earlier, she suffered from several disabilities, including sleep apnea, COPD, emphysema, arthritis and "herniating discs in my back," as well as an anxiety disorder. Id. Mortensen claimed that the anxiety disorder was the result of "the poor treatment I am receiving from you at work." Id. The letter continued for several pages describing COPD and sleep apnea, and charging Andreasen with initially granting her the accommodation of not attending meetings, then reneging on that agreement, and with insisting that she carry 30 boxes weighing up to 40 pounds when her job location was changed. Id.

Mortensen also stated that she was "having huge technical problems with Outlook 2003 as far as scheduling," because there were bugs in the program that were not being resolved by IT; she disputed Andreasen's opinion that she did not display a positive work attitude. Id. Mortensen wrote, "I have lots of people at work who like me and like working with me. You do not like me." Id.

On April 29, 2005, Andreasen sent a letter to Jennifer Crosby disagreeing with many of the assertions made in Mortensen's April 20 letter. Andreasen denied that he was faulting Mortensen because of health problems, saying, "Lori does have a major problem with meeting aceptable levels of performance. Primarily in the areas of accuracy, attitude,

accepting advise [sic], and a willingness to take on assignments she does not like." Weston Declaration, Exhibit Q. Andreasen explained the issue of attendance at extended staff meetings as follows:

> It is true I recently excused her from taking minutes of staff meetings, however Lori has had a problem with doing this for sometime. I have been remise [sic] in not requiring her to fulfill this task, too much effort. In fact Lori has told me on more than one occasion she does not like admin. work and wants to be an analyst. ... I eventually told her the analyst option would not be there, but she could continue to be my assistant. She told me she was not made to be an admin. and didn't like minutes or the day to day requirements of this type of work....
> * * *
> During this period she relayed the many personal challenges she has with her family; her mother, father, son and grandson all live with her. Feeling compassion for her I chose to not require minutes, not due to health reasons, but to the fact she said she just hated doing them. So eventually I compromised with action items only.
> * * *
> Hillary and Kellie have covered for Lori on many occasions, but Lori would at least attend the meetings. Recently she has not even done that. She has also been hostile to Hillary and Kellie at times to the point Hillary does not even want to interact with her. ...

Weston Declaration, Exhibit Q. Andreasen denied that he had made Mortensen carry her own boxes when her office was moved. Id. According to Andreasen, he did "not insist she move or pack herself, to the contrary I arranged to have it done for her. ... I would never require her to jeopardize her back to move herself. This is ridiculous." Id.

11  - OPINION AND ORDER

Andreasen stated that he had spent hours with Mortensen trying to explain that she was operating Outlook 2003 incorrectly, and "she argued with me the entire time." According to Andreasen, Mortensen had been sending out duplicate schedules for over two years that "cause my entire staff nothing but confusion and headaches," and that this was the result of Mortensen's unwillingness to accept advice and "fight[ing] everyone including me even when she is wrong." Id. Andreasen said there were no technical problems with Outlook 2003, and that no one else in the metering group was having difficulty with it. Id.

On May 9, 2005, Mortensen said in an email to Kucera-Taylor saying that although she had asked Andreasen in January 2005 to excuse her from taking notes at long meetings because of "my choking fits which are regarded by some as unseemly, my back pain, and the fatigue I experience because of my Sleep Apnea," Duckworth Declaration, Exhibit H, Andreasen had sent her an e-mail in March 2005 insinuating that it was her own choice not to attend meetings rather than the result of her medical conditions. Id. See also Mortensen dep. 101:6-18. Mortensen also complained to Kucera-Taylor that in the April 15, 2005 evaluation, Andreasen "disciplined me for not attending extended meetings, which is something he specifically excused me from doing. This is retaliation." Duckworth Declaration, Exhibit H. However, at her deposition, Mortensen acknowledged that Andreasen did not

discipline her for not attending extended meetings, and that the April 2005 performance review did not contain any negative comment about Mortensen's failure to attend staff meetings except for the statement, "She is reluctant to take minutes and action items." Mortensen dep. 104:3-105:22.

Jennifer Crosby investigated Mortensen's complaint of discrimination by Andreasen and found the allegations meritless. Duckworth Declaration, Exhibit D, Crosby deposition 43:24-48:16 (hereinafter Crosby dep.) Crosby's investigation and conclusions were reviewed and approved by her supervisor, Jeremy Courval, and Courval's supervisor, Andrea Gansen. Id. 5:20-22; Duckworth Declaration, Exhibit C, Courval deposition (hereinafter Courval dep.) 24:4-26:7; Duckworth Declaration, Exhibit E, Gansen deposition (hereinafter Gansen dep.) 13:6-15:7.

In May 2005, Mortensen applied for intermittent FMLA leave. Mortensen dep. 105:25-106:2; Duckworth Declaration, Exhibits DD and EE. On May 4, 2005, Pacificorp notified Mortensen that she had been approved for intermittent FMLA leave. Duckworth Declaration, Exhibits U, V. Mortensen took 45.25 hours of medical leave on 10 different days between May 16 and July 20. Id. at Exhibit W.

On June 1, 2005, a final written warning was placed in Mortensen's personnel file. Id. at Exhibit O. The warning charged Mortensen with, among other things, submitting the April payroll

a day late because she had been on personal time and maintained that it was too cumbersome to enable another employee to enter payroll in her absence; scheduling Andreasen on a flight that arrived at noon, even though his meeting began at noon; failing to place a director on a meeting schedule until his third request; and displaying a poor attitude. Id.; see also Exhibit M.

Mortensen responded to these criticisms on June 9, 2005. Duckworth Exhbit J. She reiterated that the calendaring problems were the result of bugs in the Outlook 2003 program. Id. Mortensen admitted to "messing up the timesheets," saying "I simply forgot to do them on the appropriate day." Id. She explained, "There's no excuse, really, I was visiting with my son and granddaughter and time slipped right past me." Id.

She denied fault in scheduling Andreasen for the noon flight, saying that Andreasen knew his flight arrived at the same time the meeting started, and that arrangements could have been made for the meeting to be postponed for 10 minutes until Andreasen could get there. Id. She denied that she had failed to get the director invited to the meeting, characterizing the problem as a "miscommunication between the two of us." Id. Mortensen characterized her work performance as follows:

> I took all the notes for all the meetings when Kellie was out for 2 periods of STD, along with my regularly scheduled rotation before that. My midyear [evaluation] reflects my efforts to run the ship for everyone while she was gone, which I gladly did. ...

> I also took on the Safety Peer Reviews on my own
> volition by making a suggestion and then designing
> the database ... and also tracking them and even
> discussing needed changes. ... I also efficiently
> tracked and followed through on the safety action
> items for Risk Assessment. I also sent you an example
> of an email where Matt Golson said how much better my
> system is than his and Jim Bennett's, and for that
> matter, PD Safety. Now my database is married with
> Safety's database, making all sorts of data splendor.
> I can't help it if that's what I do best, and most
> people enjoy what they do best.

Id.

Crosby recommended that Mortensen be transferred to another supervisor, Jim Wagner, who reported to Andreasen, but worked in Portland. Crosby testified that she made the recommendation because she believed Mortensen was in need of supervision at her job site, and Andreasen, who was in Wyoming, was unable to oversee her day-to-day work. Crosby dep. 23:9-24:5. Crosby felt that the relationship between Andreasen and Mortensen had deteriorated to the point where it was not productive. Id. Wagner was receptive to the idea, and "had very nice things to say about Lori." Id. at 24:1-3. Wagner had worked in proximity to Mortensen, and felt that he could supervise her and give her work she could do well. Id. at 24:3-5.

Wagner went over the performance improvement plan with Mortensen. Wagner dep. 31:24-33:22. In keeping with his regular practice with employees, Wagner gave Mortensen a letter outlining his expectations of her. Id. at 34:1-16. Mortensen gave Wagner a

letter from her doctor describing her sleep apnea problems, which Wagner read and questioned her about. <u>Id.</u> at 36:8-19. Wagner testified that Mortensen did not ask for specific work adjustments to accommodate her sleep apnea. <u>Id.</u> at 36:20-24.

Wagner was aware that Mortensen had made discrimination complaints against Andreasen, because Crosby had showed Wagner a copy of the letter in which Mortensen complained that Andreasen was discriminating against her. Andreasen dep. 107:15-108:14; Wagner dep. 42:6-43:6.

On June 20, 2005, Mortensen obtained a doctor's note saying she had COPD and requesting that she not attend meetings lasting more than several hours because her coughing would be disruptive to others. Duckworth Declaration, Exhibit T.

Wagner testified that after Mortensen transferred to his supervision, she failed to improve her job performance in compliance with the performance plan. Wagner dep. 46:9-47:1. He said he had discussed with all the other directors of the metering group the problem Mortensen had with sending out meeting notices, and that all of them "thought she was inept in her ability to schedule meetings." Wagner dep. 20-:1-17. According to Wagner, the directors would get three or four notices at a time through e-mail, and then, if the meeting date was changed, there would be "three or four cancellations and then three or four new ones. So it was this huge string of e-mails every time." <u>Id.</u> at

16  - OPINION AND ORDER

20:17-25.

The decision to terminate Mortensen was made by Wagner, Andreasen and three levels of Pacificorp HR personnel--Crosby, Courval, and Gansen. According to Crosby, no one person had the power to make the decision; there had to be consensus. Crosby dep. 5:14-12:2; 72:21-73:3. Gansen testified that the decision to terminate Mortensen was made on the basis of a recommendation by Wagner and Andreasen that was supported by Crosby, with final approval by herself and Andreasen. Gansen dep. 18:1-20.

On August 9, 2005, at a meeting with Wagner and Crosby, Mortensen was terminated. Wagner dep. 59:18-25. The termination letter cited examples of poor work performance while she was working under Wagner's supervision, including entering her own time after being explicitly instructed not to do so; changing her work hours without authorization; cancelling a flight for Andreasen without notice or communication, requiring the rebooking of the flight; and creating a Power Point presentation that had to be reorganized and rewritten. Duckworth Declaration, Exhibit P.

### Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). Summary judgment is not proper if material factual issues
exist for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441
(9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). On a motion
for summary judgment, the court must view the evidence in the
light most favorable to the non-movant and must draw all
reasonable inferences in the non-movant's favor. Clicks Billiards
Inc. v. Sixshooters Inc., 251 F.3d 1252, 1257 (9th Cir. 2001).

The moving party has the burden of establishing the absence
of a genuine issue of material fact. Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986). If the moving party shows the absence
of a genuine issue of material fact, the nonmoving party must go
beyond the pleadings and identify facts which show a genuine
issue for trial. Id. at 324. Assuming that there has been
sufficient time for discovery, summary judgment should be entered
against a "party who fails to make a showing sufficient to
establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at
trial." Id. at 322.

## Discussion

A.    The disability discrimination claim

In an ADA Title I case, the plaintiff must show that he or
she is "an individual with a disability who, with or without
reasonable accommodation, can perform the essential functions of

the employment position that such individual holds or desires."
42 U.S.C. § 12111(8); Kennedy v. Applause, Inc., 90 F.3d 1477,
1481 (9th Cir. 1996). To establish a prima facie case, therefore,
the plaintiff must show that 1) he or she is a disabled person
within the meaning of the ADA; 2) he or she is able to perform
the essential functions of the job with or without reasonable
accommodation; and 3) he or she suffered an adverse employment
decision because of his or her disability. §§12112(b)(5)(A) &
12111(8); see also Kennedy, 90 F.3d at 1481. The same standard
applies to cases brought under Oregon disability discrimination
law. Snead v. Metropolitan Property & Cas. Ins. Co., 237 F.3d
1080, 1087-88 (9th Cir. 2001).

Pacificorp contends that it is entitled to summary judgment
on the disability discrimination claim because 1) Mortensen
cannot establish that she is disabled and 2) Mortensen cannot
show that she suffered an adverse employment action because of a
disability.

1.  Does Mortensen have a disability?

To bring a claim under the ADA a plaintiff has the burden
of showing that he or she is a "qualified individual with a
disability." Barnett v. U.S. Air, Inc., 228 F.3d 1105 (9th Cir.
2000)(en banc), vacated on other grounds, 535 U.S. 391 (2002).

In determining what constitutes a disability under the ADA
or under Oregon law, the court looks to the statutory definition:

> (A)   a   physical   or   mental   impairment   that
> substantially limits one or more of the major life
> activities of such individual;
> (B) a record of such impairment; or
> (C) being regarded as having such an impairment.[5]

42 U.S.C. § 12102(2). Oregon law is similar. See Or. Rev. Stat.
§ 659.400(1).

Under the implementing regulations, an impairment is substantially limiting if it "significantly restricts as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii)(1993). Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. at 1630.2(i).

In addition, the regulations enumerate the following factors that should be considered in determining whether an individual is substantially limited in a major life activity: 1) the nature and severity of the impairment; 2) the duration or expected duration of the impairment; and 3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. Id. at § 1630.2(j)(2).

---

[5] Mortensen's claims are based on allegations that she is disabled and that she has a record of a disability.

Mortensen stated at oral argument that the only major life activity in which she is limited is that of sleeping. Sleeping is a "major life activity" for purposes of the ADA. McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999), *amended,* 201 F.3d 1211 (9th Cir. 2000); Head v. Glacier Northwest, 413 F.3d 1053, 1060 (9th Cir. 2005).[6]

Establishing a disability requires more than a showing that one is limited in a major life activity. The limitation must be severe or substantial when compared to the ability of "the average person in the general population," McAlindin, 192 F.3d at 1235, citing 29 C.F.R. §§ 1630.2(j)(1)(i) and 1630.2(j)(2)(i), and its impact must be permanent or long term. Toyota Motor Mfg. Kentucky Inc. v. Williams, 534 U.S. 184, 198 (2002).

///

---

[6] Neither of these cases involves a plaintiff with sleep apnea or COPD. In McAlindin, plaintiff suffered from anxiety disorders, panic disorders, and somatoform disorders, and alleged that he was limited in the ability to engage in sexual relations, sleep, and interact with others. Plaintiff testified that despite the use of medication, he continued to experience severe insomnia. Id.

In Head, plaintiff was diagnosed with depression or bipolar disorder. Plaintiff alleged that he was substantially impaired in his ability to sleep, interact with others, think, and read. The court held that each of these was a major life activity. 413 F.3d at 1059. The court held that plaintiff had established a substantial impairment in the ability to sleep by means of his testimony that even after getting on medication, he "periodically had serious problems," including passing out for a while immediately after getting home from work, having great difficulty getting to sleep, waking up during the night, sleeping only five to six hours a night even with the medication, and, on some nights, even with the medication, not getting to sleep for hours or even at all. Id. at 1060.

Under this test for proving disability, it is insufficient for Mortensen merely to submit evidence of a medical diagnosis. Toyota Motor, 534 U.S. at 198. Instead, the ADA requires her to offer evidence that the extent of the limitation caused by the impairment, in terms of her own life experience, is substantial. Id. The question of whether an impairment constitutes a disability is not to be answered only by analyzing the effect of the impairment in the workplace. Id. at 201. Occupation-specific tasks may have only limited relevance. Id.

Mortensen asserts that she has offered evidence from which a jury could find that her sleep apnea and COPD substantially limited the major life activity of sleeping. This evidence is 1) her testimony that she fell asleep at work several times a day for approximately six months; 2) that she had probably been experiencing symptoms of sleep apnea as early as 2001; 3) that lack of sleep affected her memory; 4) that lack of sleep caused her to make more errors at work; and 5) that lack of sleep and made her grumpy.

Mortensen's testimony alone may suffice to establish a genuine issue of material fact. Head v. Glacier Northwest Inc., 413 F.3d 1053, 1058 (9th Cir. 2005). But Mortensen's testimony about each of the areas in which she was limited by sleeplessness is directly contradicted by her other testimony and by statements she made to Pacificorp. In other words, she herself has

contradicted each of her allegations of substantial limitation.

On the one hand, Mortensen claims that sleeplessness caused her to make more errors at work, and that while the diagnosis was made in July 2004, the symptoms began as early as 2001 and continued through October 2005. On the other hand, she has denied Andreasen's testimony that her work performance deteriorated during her third and fourth years of employment (2004 and 2005). She has also denied every one of the mistakes with which she was charged by Andreasen. She has insisted that the difficulties she had with meeting notices and calendar management were attributable solely to technical problems with the computer program she was using. Mortensen dep. 107:5-24; Weston Declaration, Exhibit N. She has denied that she made any significant errors with Andreasen's expense accounts, testifying that in the three and a half years before her termination, she had only three expense account charges rejected by a supervisor, and two of them were the result of Andreasen's request that she split a $400 charge to avoid raising an accounting "red flag." Mortensen dep. 7:20.

On the one hand, Mortensen claims that sleeplessness made her grumpy. But on the other, she denied Andreasen's criticism that she had difficulty getting along with others, stating that most of the management team thought she was wonderful. Mortensen dep. 111:15-112:21. Mortensen characterized as untrue Andreasen's

statements that she did not display a positive workplace attitude. Duckworth Declaration, Exhibit H.

Mortensen claims that she was falling asleep several times a day at work for a period of six months. But she denied Andreasen's criticism that she was unavailable during work hours, saying she got to work every day at 6:05 and left at 4:40 p.m., Mortensen dep. 112:25-113:11, and that she worked a 40-hour work week throughout her four years at Pacificorp. Mortensen dep. 11:24-13:6; 31:14-20. Mortensen acknowledges that except for the request to be excused from extended staff meetings, she asked for no adjustments to her schedule or her work duties. Mortensen dep. 60:16-24.

Further contradicting her claims of falling asleep during the day, errors at work and memory problems, Mortensen emphasized in the May 2005 memorandum to Jennifer Crosby, "the fine work I continue to do as a valued member of the Safety Committee," where she spent the majority of her work time. About the Safety Committee, Mortensen said, "I am so proud of the work I have done for the Committee ... and things seem to continue to improve and grow more challenging daily." Duckworth Declaration, Exhibit H. She also pointed out, "[D]ue to covering for Kellie's time off, I have been involved in a few presentations for Blaine, and he was very pleased with them at the time." Id. Mortensen insisted that she had performed her work duties "faithfully and accurately

24  - OPINION AND ORDER

for four years now, and I would have ... no problem continuing them." Id.

In further contradiction of her claims of falling asleep at work, workplace errors, and memory problems, Mortensen pointed out to Crosby that she had actually taken on extra duties during the time she claims she was suffering from sleep apnea, saying, "My midyear [evaluation] reflects my efforts to run the ship for everyone while [Kellie] was gone." Mortensen specifically noted that during this time she had also designed a database, "efficiently tracked and followed through" on safety action items, and done a good job at analysis. Duckworth Declaration, Exhibit J.

In the June 2005 letter to Jennifer Crosby, Mortensen acknowledged that one occasion she had forgotten to do timesheets, but she did not attribute this to sleeplessness. Instead, she said there was "no excuse," and that she had been visiting with family and the "time slipped right past me."

Mortensen's testimony about her activities outside work also contradicts her claims that sleeplessness made her drowsy during the day and affected her memory. She testified that her daily activities outside work included cooking for herself, her 80-year-old father, and her 27-year-old son, all of whom live with her. Mortensen dep. 10:9-18; 11:21-12:6; 12:11-18. She helped her father "get through the day," taking him to

25  - OPINION AND ORDER

appointments and, "because he has a very bad memory," helping him in general. Id. at 12:11-19. She also performed household maintenance, id. at 12:25-13:4, cleaned the house, except for "anything that might hurt my back," id. at 12:25-13:4, gardened, 70:6-18, and assisted in the care of her family's 11 dogs, parrot and cat. Id. 18:2-14.

If the factual context makes the nonmoving party's claim of the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support her claim than would otherwise be necessary. In re Agricultural Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990). In the context of all the evidence, Mortensen has not demonstrated the existence of a material issue of fact on her claim that she is substantially limited in the major life activity of sleeping, because, through her own statements and testimony, she has denied her claims that she was unable to stay awake during the day, and that sleeplessness affected her memory, caused her to make more errors at work, and made her grumpy. In essence she has eliminated any material question of fact on whether she has an impairment that substantially limits a major life activity. I conclude that Mortensen has not established that she was disabled.

2.   Does Mortensen have a record of a disability?

Mortensen argues that she has also adduced evidence of a

record of disability. A record of a disability means that the employee has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities. 29 C.F.R. § 1630.2(k). Pacificorp argues that Mortensen's complaint alleges no facts supporting a "record of" disability claim, and that discovery has revealed no facts supporting the claim. Pacificorp cites Walz v. Marquis Corp., 2005 WL 758253 at *6 (D. Or. 2005), rejecting a "record of" disability claim because "[a]lthough [the employee's] records reveal that [employee] suffers from type II insulin-dependent diabetes, they fail to reveal a level of impairment that substantially limits one or more major life activities."

In Coons v. Secretary of U.S. Dept. of the Treasury, 383 F.3d 879, 886 (9th Cir. 2004) the court held that the record must be of an impairment that substantially limits a major life activity. In Coons, plaintiff's only evidence was a letter from his doctor stating that he suffered from various physical and mental impairments, and that he received treatment for some of these impairments. There was nothing in the letter saying that any of the treated impairments substantially limited any major life activity. The court held that because the plaintiff "presents no evidence of having a history of an impairment that substantially limits a major life activity," he was not a disabled person under this ADA test. Id.

27  - OPINION AND ORDER

In this case, as in <u>Coons</u> and <u>Walz</u>, the historical record shows only that Mortensen has been diagnosed with, and is being treated for, sleep apnea and COPD.[7] As discussed above, the evidence, on this record does not establish a history of an impairment that substantially limits a major life activity.

Because Mortensen has failed to establish that she is a disabled person, Pacificorp is entitled to summary judgment on the disability discrimination claims.

B.    <u>The retaliation claims</u>

Pacificorp contends that it is entitled to summary judgment on the retaliation claim because Mortensen cannot show a causal link between any protected activity and her termination.

Title V of the ADA prohibits retaliation against or interference with a person who has asserted rights under the ADA. See 42 U.S.C. §§ 12203(a) & (b). In <u>Barnett</u>, 228 F.3d at 1121, the court adopted for ADA retaliation claims the framework used to analyze retaliation claims under Title VII of the Civil Rights Act. Thus, in order to establish a prima facie case of retaliation under the ADA, Mortensen must show 1) she engaged in a protected activity; 2) she suffered an adverse employment

---

[7] Although the record indicates that Mortensen took FMLA leave, there is no evidence about whether this leave was related to her sleep apnea or COPD. *Compare* <u>Snead v. Metropolitan Property & Cas. Ins. Co.</u>, 237 F.3d 1080, 1089 (9th Cir. 2001)(paid and unpaid disability leave can establish evidence of a record of being impaired).

decision; and 3) there was a causal link between the protected activity and the adverse decision. <u>Brown v. City of Tucson</u>, 336 F.3d 1181, 1187 (9th Cir. 2003).

To establish causation, plaintiff must show, by a preponderance of the evidence, that engaging in the protected activity was one of the reasons for her firing, and that but for such activity, she would not have been fired. <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1064-65 (9th Cir. 2002).

An action for retaliation under the ADA follows the burden-shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Barnett</u>, 228 F.3d at 1121; <u>Brown</u>, 336 F.3d at 1186. Thus, if the plaintiff makes out a prima facie case of retaliation, the employer has the burden of producing a legitimate nondiscriminatory reason for the adverse employment decision. The plaintiff must then prove that the employer's proffered reason is mere pretext and that the decision was made as retaliation for the protected activity.

Pacificorp argues that Mortensen cannot establish a prima facie case of retalition because she cannot show a causal connection between her request that she be excused from extended meetings and/or her complaint about Andreasen and her termination and, even if she could, Pacificorp terminated her for the legitimate nondiscriminatory reason of poor performance.

///

a. Prima facie case

Mortensen relies on the temporal proximity of her March 2005 complaint that Andreasen was discriminating against her and the subsequent disciplinary steps taken against her. She also argues that after requesting that she not be required to take minutes in long meetings, Andreasen followed up over the next four months with a quick succession of adverse employment actions, including a negative performance review and placing Mortensen on a performance improvement plan.

In some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity, see, e.g., Villiarimo, 281 F.3d at 1065; Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 507 (9th Cir. 2000), particularly when the adverse action occurs "fairly soon after the employee's protected expression." Villiarimo, 281 F.3d at 1065. See also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)(cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence uniformly hold that the temporal proximity must be very close).

Under the McDonnell Douglas framework, the requisite degree of proof necessary to establish a prima facie case on summary judgment is "minimal and does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co.,

26 F.3d 885, 889 (9th Cir. 1994); <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220 (9th Cir. 1998). The time interval between Mortensen's complaints about discrimination by Andreasen and the disciplinary actions taken against her is sufficient for a prima facie showing of causation.

### b. Legitimate, nondiscriminatory reason

If the plaintiff makes out a prima facie case, the employer can rebut it by producing evidence of a legitimate, nondiscriminatory explanation for its actions. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506-07 (1993)(if plaintiff establishes prima facie case, burden of production shifts to employer to articulate a nondiscriminatory reason for adverse employment action, causing the presumption created by the prima facie case to fall away.) See also <u>Wallis</u>, 26 F.3d at 892. The employer must produce evidence, not merely express an argument. <u>Rodriguez v. GMC</u>, 904 F.2d 531, 533 (9th Cir. 1990). Pacificorp has met its burden of producing evidence that Mortensen was terminated for poor work performance.

### c. Pretext

Mortensen can establish pretext in two ways:

(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer.

Chuang, 225 F.3d at 1127. To survive summary judgment, Mortensen is not required to provide direct evidence of discriminatory intent as long as a reasonable factfinder could conclude, based on her prima facie case and the factfinder's disbelief of defendant's reasons for discharge, that discrimination was the real reason for defendant's actions. Nidds v. Schindler Elevator Corp., 113 F.3d 912, 918 n. 2 (9th Cir. 1997). Mortensen can survive summary judgment without producing any evidence of discrimination beyond that constituting her prima facie case, but only if her prima facie evidence raises a genuine issue of material fact on the truth of Pacificorp's asserted reasons for terminating her. Chuang, 225 F.3d at 1127.

A plaintiff is required to produce "very little" direct evidence of an employer's discriminatory intent to move past summary judgment. Id. at 1128. Direct evidence of discrimination is "evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption." Godwin, 150 F.3d at 1221; Bergene v. Salt River Project Agricultural Improvement and Power District, 272 F.3d 1136, 1141 (9th Cir. 2001).

Alternatively, the plaintiff may come forward with circumstantial evidence that the employer's proffered reasons were pretextual, but such circumstantial evidence must be "specific" and "substantial" to create a triable issue of fact as

to whether the employer intended to discriminate. <u>Godwin</u>, 150 F.3d at 1222.[8] A plaintiff can make a case that an employer is biased by showing the employer's proffered explanation for the adverse action is "unworthy of credence." <u>Coghlan v. American Seafoods Co. LLC</u>, 413 F.3d 1090, 1095 (9th Cir. 2005)(quoting <u>Burdine</u>, 450 U.S. at 256). As the Supreme Court explained in <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147 (2000), "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."

In deciding whether judgment as a matter of law is appropriate, the court looks at "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation if false, and any other evidence that supports the employer's case." <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 148-49 (2000).

Mortensen argues that she has raised a genuine factual issue on whether Pacificorp's articulated reasons for her

---

[8]   But see <u>Cornwell v. Electra Cent. Credit Un.</u>, 439 F.3d 1018, 1030-31 (9th Cir. 2006) (discussing whether post-<u>Godwin</u> cases may have overturned the <u>Godwin</u> requirement that a plaintiff's circumstantial evidence of pretext must be "specific and "substantial," but not finally deciding the issue because the evidence presented by the plaintiff was sufficient to create a genuine issue of fact regarding the defendant's motive for its actions under the <u>Godwin</u> specific and substantial standard in any event).

termination were pretextual. She points to deposition testimony from Andreasen that he was surprised and hurt by Mortensen's discrimination complaint:

> Q:  What do you recall about the letter that you saw that accused you of discrimination? ...
> A:  ... I just remember my surprise and awe at it.
> Q:  Surprise and awe?
> A:  Yeah.
> Q:  Any other reactions?
> A:  Yeah. There was a bit of shock associated with that. I did not anticipate--I did not anticipate that, and that's probably it.
> Q:  Were you angry about it?
> A:  To be honest, no. I wasn't angry as much as I was hurt.
> Q:  Why were you hurt?
> A:  Just I-you know, I think I've stated it several times here that I really did appreciate the job that Lori did. Specifically the first couple two and a half, three years. I think she was-I think she was helpful to the department. I think she was well meaning towards me, and I towards her. So essentially this had come to that, and yeah, I was hurt.

Andreasen dep. 92:8-93:5.

Mortensen also relies on her own testimony that after she complained about Andreasen, the management team treated her coldly and "all my duties were pulled immediately after my complaint." Mortensen dep. 31:2-13; 162:14-23; 165:1-22. Mortensen has not proffered any evidence about who treated her coldly, or what this treatment consisted of. Mortensen's own words contradict any inference that she was treated coldly by Jim Wagner, her successor supervisor. By June 2005, after Mortensen had been reassigned to Wagner, she characterized him in her June

34  - OPINION AND ORDER

9, 2005 letter to Crosby as follows:

> I believe in my heart that Jim Wagner is a good and
> honest man. I believe that if perceives [sic] my
> performance is good, he will tell you that. ... I
> bring value to this Company, I think it is the best
> place I've ever worked, and now I'm working for the
> best man I've ever worked for. That is my belief.

Duckworth Declaration, Exhibit J.

Mortensen has not explained what is meant by her testimony
that "all my duties were pulled" immediately after complaining
about Andreasen. There is no indication of what, if any, duties
were taken away from her. Mortensen complained about Andreasen in
April 2005 and was terminated in August 2005; the evidence is
that she continued to work 40 hours a week during that interval.
The only explanation offered is by Pacificorp, which is that
Mortensen may have been referring to her lighter workload once
Wagner became her supervisor, based on Wagner's testimony that
when Mortensen worked for him he was out of the office more than
usual and not requiring as much assistance from Mortensen. Wagner
dep. 52:5-56:2.

Mortensen also relies on her assertion that Andreasen
reneged on his promise to excuse her from taking minutes at
extended meetings by disciplining her in the April 15, 2005
performance evaluation for not attending them.

The April 15 warning is based on deficiencies in accuracy
in "all aspects of job performance," including expense accounts,

meeting notices, calendar management, and work product; workplace
demeanor and approachability, including accepting advice and
counsel and working positively with others; work availability
between the hours of 7:00 a.m. and 4:00 p.m.; and lack of
availability or willingness to attend meetings to take action
items and minutes. In the April 15 performance evaluation,
Andreasen made references to Mortensen's "reluctance" to attend
staff meetings, along with numerous other specific complaints of
poor performance, to justify his low performance rating.

    The record is unclear on whether the meetings referenced in
the April 15 documents are the same extended meetings from which
Mortensen asked to be excused. But drawing every reasonable
inference in Mortensen's favor, I will assume that Andreasen's
criticism of Mortensen for not attending staff meetings was
groundless.

    The net result is that Mortensen challenges two of the
deficiencies named in the April 15 evaluation: meeting attendance
and work availability.

    In assessing Mortensen's showing of pretext, I must balance
the strength of Mortensen's prima facie case, the probative value
of her proof that Pacificorp's explanation of her termination is
false, and any other evidence that supports the employer's case.
Reeves, 530 U.S. at 148-49.

    The causation element of Mortensen's prima facie case rests

entirely on the timing of her termination. The probative value of her proof the Pacificorp's explanation is false rests on the challenges to Andreasen's criticisms about meeting attendance and work availability. Other evidence that supports Pacificorp's case includes the evidence that in April 2005, Mortensen requested a different supervisor, and that Pacificorp complied with this request by putting her under the supervision of Wagner, a man she clearly liked and who liked her, and who was in a position to work more closely with her in order to provide her the opportunity to improve her work performance. This suggests a good faith effort on the part of Pacificorp to give Mortensen the opportunity to bring her performance into compliance with the improvement plan.

After consideration of all this evidence, I conclude that Mortensen's evidence is not specific or substantial enough to establish that Pacificop's proffered reasons for terminating her were a pretext for retaliation. I conclude that Mortensen has not raised a material issue of fact tending to establish that Pacificorp's asserted reason for terminating her was pretextual. Pacificorp is entitled to summary judgment on the retaliation claims.

3.    The FMLA claim

Pacificorp contends that Mortensen's FMLA claim fails as a matter of law because she cannot demonstrate that her taking of

FMLA-protected leave constituted a negative factor in the decision to terminate her.

A claim alleging that an employee was terminated in violation of FMLA is not analyzed under the "discrimination" or "retaliation" provisions of the FMLA. Bachelder v. America West Airlines, Inc., 259 F.3d 1112 (9th Cir. 2001). A claim that an employer visited negative consequences on an employee because she has used FMLA leave is covered under the FMLA provision governing "interference," 29 U.S.C. § 2615(a)(1). Bachelder, 259 F.3d at 1124. Under this provision, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by this subchapter." The McDonnell Douglas burden-shifting framework for employment discrimination and retaliation claims is inapplicable to claims under § 2615(a)(1). Xin Liu v. Amway Corp., 347 F.3d 1125, 1135(9th Cir. 2003).

When an employee alleges that her FMLA leave was impermissibly considered in the decision to terminate her, courts in this jurisdiction apply the standard set forth by the Department of Labor in 29 C.F.R. § 825.220(c). Xin Liu, 347 F.3d at 1135. Accordingly, a triable issue of material fact requires a showing by the plaintiff that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her. Bachelder, 259 F.3d at 1125.

Mortensen testified that she knew nothing of FMLA leave until someone from Pacificorp's HR department told her about it. Mortensen requested, and received, intermittent FMLA leave in May 2005. The record indicates that by May 2005, the negative performance evaluations, the investigation of her discrimination complaint against Andreasen, and, possibly (the record is unclear) the transfer to Wagner's supervision, had all taken place. There is no evidence in the record before me that Mortensen's taking of FMLA-protected leave constituted a negative factor in the decision to terminate her. Because she cannot establish a causal connection between her invocation of FMLA leave and her termination, Pacificorp is entitled to summary judgment on this claim.

4.   The OFLA claim

Pacificorp contends that Mortensen's OFLA claim fails because there is no cause of action under OFLA for retaliatory discharge. Pacificorp is correct. Stewart v. Sears, Roebuck and Co., CV 04-428-HU (April 15, 2005); Loumena v. Les Schwab Tire Centers of Portland, Inc., CV01-856-KI (October 2, 2003); Denny v. Union Pacific Railroad, CV 00-1301-HU (F & R October 31, 2002, adopted by Jones, J., January 30, 2003).[9]

---

[9] In Denny v. Union Pacific Railroad Co., 173 Fed. Appx. 549, 551 (9th Cir. 2006),an unpublished opinion, the Ninth Circuit reversed the holding in Denny that there is no claim for retaliation, relying on Yeager v. Providence Health Sys. Or., 195 Or. App. 134 (2005). The Ninth Circuit nonetheless affirmed, since

Pacificorp is entitled to summary judgment on this claim.

5.    Wrongful discharge claim based on FMLA and OFLA

        Pacificorp is entitled to summary judgment on this aspect of the wrongful discharge claim because, as discussed, Mortensen has not shown a causal connection between her invocation of FMLA/OFLA protected rights and her termination.

6.    Wrongful discharge claim based on disability discrimination

        Pacificorp has argued that this claim is preempted by Oregon's disability discrimination and retaliation laws, citing Galenbeck v. Newman & Newman, CV 02-6278-HO, 2004 WL 1088289 (D. Or. May 14, 2004). Mortensen has not addressed this argument. Pacificorp is entitled to summary judgment on this claim.

### Conclusion

        Defendant Pacificorp's motion for summary judgment (doc. # 17) is GRANTED.

        IT IS SO ORDERED.

        DATED this 1st day of February, 2007.

                                /s/  Dennis James Hubel
                                Dennis James Hubel
                                United States Magistrate Judge

---

the error was deemed harmless in light of the factual findings at trial. This unpublished opinion is dicta in that the error, if any, was harmless. In addition, the Yeager opinion does not address the reasons the Denny trial court found there was no OFLA retaliation claim, and it is not a decision of the Supreme Court of Oregon.